**WIEN AIR ALASKA, INC., Appellant,**

v.

**DEPARTMENT OF REVENUE, STATE OF ALASKA, Appellee.**

No. 5594.

Supreme Court of Alaska.

July 9, 1982.

Robert H. Hume, Jr., of Keane, Harper, Pearlman & Copeland, and Ralph Stemp, Anchorage, for appellant.

Amy J. Stephson, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.*

## OPINION

BURKE, Justice.

This appeal presents the central question of whether the Alaska Department of Revenue was bound by its interpretation of a tax statute as stated in a letter sent to an accounting firm in reply to a request from the firm for general tax information. We hold that the department was not bound.

In 1973, Wien Air Alaska, Inc. (Wien) contracted to purchase two airplanes and other equipment for approximately fourteen million dollars. The airplanes and equipment were received and placed in service by Wien in 1975. Under the Alaska tax statutes in effect prior to 1975, this transaction would have entitled Wien to an investment tax credit of approximately $200,000 toward 1975 taxes.[1]

However, in June 1975, the Alaska Legislature enacted AS 43.20.036, expressly mak-

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11 of the Constitution of Alaska, and Alaska R.Admin.P. 23(a).

1. Prior to 1975, AS 43.20.010(b) permitted Alaska taxpayers to take the investment tax credit. The statute incorporated by reference the provisions of chapter 1 of subtitle A of the Internal Revenue Code which included the sections on the investment tax credit. 26 U.S.C. §§ 38, 46–50 (1976).

ing it retroactive to January 1, 1975. Ch. 153, § 2, SLA 1975. AS 43.20.036(b) limited the investment tax credit to the first $500,-000 of qualified investments in a given year.

In September, Price, Waterhouse and Company (Price) sent a letter to the Deputy Director of the Audit Division of the Department of Revenue. The letter requested the Department of Revenue to furnish Price with general information which it intended to use in publishing its own release on Alaska tax law. One question asked in the Price letter sought information on Alaska's investment tax credit:

Are any provisions made for property placed in service after December 31, 1974, but under a contract that was binding at December 31, 1974?

In November, the department responded to this question:

The State of Alaska will follow the same guidelines as set forth by the Internal Revenue Code for determining the date of acquisition of property for Investment Tax Credit.

Later in November, Price sent the department a draft copy of the tax bulletin it was planning to send its subscribers. In the draft, Price stated its interpretation of the department's position on the Alaska Investment Tax Credit:

The Department of Revenue will allow pretermination transitional rules to determine whether an investment in qualified property is subject to the new $500,000 annual limitation. Pretermination property rules of Internal Revenue Code Section 49(b) are applicable with December 31, 1974, being substituted for April 19, 1969, in applying this section to Alaska.

Later Price telephoned the department and asked whether the statement in the release accurately reflected Alaska law on investment tax credits. The department replied orally that the tax release appeared to be correct.

**2.** Former 26 U.S.C. § 48(h) provided in part:
*Suspension of investment credit.*—For purposes of this subpart—

Subsequently, Price prepared and filed Wien's 1975 tax returns with the department. These returns claimed an investment tax credit for the two aircraft and other equipment ordered by Wien in 1973 and put in service in 1975. Wien followed the binding contract rule and used the full value of the property to calculate the credit without regard to the new $500,000 limitation.

In 1978, Wien filed with the department a refund claim based upon an operating loss. While examining the refund claim, the department audited Wien's tax returns from 1973 through 1977. The department then discovered and disallowed the investment tax credit taken by Wien in its 1975 return to the extent it was calculated on property valued above the $500,000 limit.

Wien then sought administrative review of the reduction of its refund claim. After a formal hearing, the department held that AS 43.20.036(b) does not incorporate the binding contract rule and that the statements made by the department in 1975 to Price did not bind the department. On Wien's appeal to the superior court, the department's decision was affirmed.

Wien now appeals the superior court decision affirming the department's decision. Wien contends that the superior court erred in finding (1) that AS 43.20.036(b) does not incorporate the binding contract rule from former section 49(b) of the Internal Revenue Code and (2) that the department was not bound by its statements made in the 1975 letter and phone call.

I.

Does AS 43.20.036(b) Incorporate the Federal Binding Contract Rule?

Wien maintains that AS 43.20.036(b) incorporates the federal binding contract rule which was in effect during two suspensions of the federal investment tax credit. Former 26 U.S.C. §§ 48(h)(3), 49(b) (1976).[2]

(1) *General rule.*—Section 38 property [property eligible for the investment tax credit] which is suspension period property shall

The effect of the federal binding contract rule was to make otherwise ineligible suspension period property eligible for an investment tax credit if it had been acquired pursuant to a binding contract to purchase entered into before the beginning of the suspension periods.

The relevant language of AS 43.20.036(b) provides:

> For purposes of calculating the income tax payable under this chapter, the taxpayer may apply as a credit against his tax liability the job development investment credit allowed as to federal taxes under Internal Revenue Code § 50 *upon only the first $500,000 of qualified investment put into use for each taxable year* (26 U.S.C. § 50).

(Emphasis added.)

Wien's chief argument that this section incorporates the binding contract rule is based on the doctrine of contemporaneous administrative construction of the statute by the Alaska Department of Revenue. First, Wien contends that the language of the statute is ambiguous. Wien then contends that the 1975 letters and oral conversations between the department and Price indicated that the department then construed the statute as incorporating the binding contract rule. Wien then goes on to argue that this contemporaneous admin-

istrative construction should be preferred over the department's current interpretation of the statute as not incorporating the binding contract rule.

 We disagree with Wien's conclusion. While contemporaneous administrative construction is a valuable aid in determining the meaning of a statute, it is not conclusive. *Public Defender Agency v. Superior Court*, 534 P.2d 947, 952 (Alaska 1975); *see* Annot., 39 L.Ed.2d 942, §§ 2, 8, 9 (1975) (collection of United States Supreme Court cases on weight to be given administrative constructions of statutes). Cases relying on contemporaneous administrative construction usually also note agency reliance on a long standing and continuous construction of the statute. Annot., 39 L.Ed.2d 942, § 9 (1975). As repeatedly noted by our court, it is within the court's special competency to independently interpret a statute. *Weaver Bros., Inc. v. Alaska Transportation Commission*, 588 P.2d 819, 821 (Alaska 1978). An administrative agency's interpretation of a statute is not binding on a court, but is merely entitled to some weight in deciding the correct interpretation when a statute is ambiguous. *State, Dept. of Highways v. Green*, 586 P.2d 595, 602 n.21 (Alaska 1978).

not be treated as new or used section 38 property.

(2) *Suspension period property defined.*—Except as otherwise provided in this subsection and subsection (i), the term "suspension period property" means section 38 property—

(A) the physical construction, reconstruction, or erection of which begins either during the suspension period or pursuant to an order placed during such period, or

(B) which is acquired by the taxpayer either during the suspension period or pursuant to an order placed during such period.

(3) *Binding contracts.*—To the extent that any property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on October 9, 1966, and at all times thereafter, binding on the taxpayer, such property shall not be deemed to be suspension period property.

Pub.L.No. 89–800, § 1, Nov. 8, 1966, 80 Stat. 1508, 1513.

Former 26 U.S.C. § 49 provided:

*Termination for period beginning April 19, 1969, and ending during 1971.*

(a) *General rule.* For purposes of this subpart, the term "section 38 property" does not include property (1) the physical construction, reconstruction, or erection of which is begun after April 18, 1969, or (2) which is acquired by the taxpayer after April 18, 1969, other than pre-termination property. This subsection shall not apply to property described in section 50.

(b) *Pre-termination property.* For purposes of this subpart—

(1) *Binding contracts.* Any property shall be treated as pre-termination property to the extent that such property is constructed, reconstructed, erected, or acquired pursuant to a contract which was, on April 18, 1969, and at all times thereafter, binding on the taxpayer.

Pub.L.No.91–172, Title VII, § 703(a), Dec. 30, 1969, 83 Stat. 660; and amended Pub.L.No.92–178, Title I, § 101(b)(1)–(4), Dec. 10, 1971, 85 Stat. 498, 499.

In the present case, while it might be argued that in 1975 the department did interpret section 36(b) as incorporating the binding contract rule, this interpretation was neither long standing nor consistent. Within a couple of years the department had changed its position. Wien has pointed to no other instances where the department interpreted or applied the statute on this issue. There is only the 1975 information letter ambiguously referring to the "guidelines as set forth in the Internal Revenue Code for determining the date of acquisition of property for Investment Tax Credit." Considering the two conflicting administrative interpretations of the statute, neither is entitled to any special weight based on a "presumption" arising from prior administrative interpretations.

On the other hand, the department argues that the statute is unambiguous as to whether the binding contract rule applies. The department notes that the words of the statute do not expressly refer to the binding contract rule, and therefore, the department argues, it should not be deemed that the legislature intended to adopt it.

The department's reasoning is no more convincing than Wien's. The statute expressly states that it incorporates the federal investment tax credit with a $500,000 limit. The binding contract rules were part of the federal investment tax credit sections of the time section 36(b) was adopted. One reasonable interpretation of section 36(b) would be that the $500,000 limitation should be implemented by following the federal binding contract rule since the Alaska statute appears to incorporate by implication all the federal investment tax credit sections.

In fact, Wien's interpretation of section 36(b) as incorporating the binding contract rule would be the most persuasive were it not for two factors. First, the legislative history of section 36(b) shows that it was enacted to stop the flow of potential state revenues to other states. The transmittal letter from the governor to the legislature stated as follows:

I am submitting this bill for the purpose of closing certain corporate tax loopholes. The bill would eliminate the foreign tax credit, the depletion allowance, and the exemption for domestic international sales corporations (DISC), and would place a limit on the amount of investment credit for Alaskan income tax purposes.

. . . .

A limit would also be placed on the investment credit which could be taken on the Alaska income tax return.

For federal economic policy reasons, the investment credit has been used to encourage business investment in plant and equipment. Any added incentive which the Alaska credit gives is insignificant when compared to the loss of state revenue. Most of the investment credit is taken by multistate corporations in which the tax incentive does not necessarily lead to more Alaskan investment, but leads [instead to] an export of state tax revenue to other states. The investment credit would still be available under this bill upon the first $100,000 in qualified investment for local small businesses.

By eliminating these corporate tax devices, we hope to place our individual and corporate taxpayers on a more equal basis, with our corporate taxpayers paying a fairer share of Alaska income taxes.

1975 House Journal 295–96. This letter indicates that the legislature may have agreed with the governor's reasoning that the investment tax credit served no viable policy purpose in Alaska. Rather, the investment tax credit simply allowed large "outside" businesses to escape substantial Alaska taxes. The bill was intended to stop this outflow of money while still allowing smaller local businesses a tax break.

■ Second, the effect of section 36(b), which was passed by the legislature in June 1975, was expressly made retroactive to January 1, 1975. Ch. 153, § 2, SLA 1975. This action shows the urgency with which the legislature felt that the credit should be eliminated. More importantly, this retroactive implementation of section 36(b) is inconsistent with the application of the federal binding contract rule. Under the application of the binding contract rule, as urged by Wien, businesses with contracts prior to

January 1, 1975, the effective date of the $500,000 limitation, would be immune from the limit. On the other hand, a business which entered into a contract after January 1, 1975, but before June, would be subject to the limitation because the retroactive effective date would apply, while the binding contract rule would not. The same result would obtain even if the taxpayer had both contracted for and taken delivery of property in 1975, prior to June. Such a result would be illogical. The rationale of the binding contract rule would not be served by such an interpretation since both hypothetical businesses would have entered into binding contracts assuming that the investment tax credit would be available. The federal binding contract rule may be regarded as a rule of fairness. Congress evidently thought that taxpayers who make binding commitments based on existing law are entitled to be protected against changes in the law. However, in making section 36(b) retroactive, our legislature rejected that conception of fairness. When the retroactive effective date is considered along with the governor's transmittal letter, it is logical to assume that the legislature intended to end immediately any and all investment tax credits based on property above the $500,000 limit, without solicitude to the reliance of businesses on the tax credit in making their business decisions. Therefore, we interpret AS 43.20.036(b) as not incorporating the federal binding contract rule.

## II.

Did the 1975 letters and oral conversations between the department and Price bind the department to its original interpretation of AS 43.20.036(b) as incorporating the binding contract rule?

Wien contends that even if AS 43.-20.036(b) does not itself incorporate the binding contract rule, the Department of Revenue was bound by its statement in the 1975 letter indicating that the department would apply the binding contract rule [3] and could not retroactively change its interpretation of the section. Wien makes several arguments in support of its contention that the department was bound by the letter. First, Wien maintains that the statement in the letter was a "binding regulation." Second, Wien asserts that the 1980 decision denying Wien the tax credit was an "order of repeal" which could not be applied retroactively to change the 1975 letter's position. Finally, Wien contends that even if the department has the power to retroactively apply its decisions, in this case it abused its discretion in unreasonably denying the tax credit to Wien. None of these contentions have merit.

### A.

What Effect Does AS 43.20.021(a)'s Incorporation of Federal Law on Tax Rulings and Letters Have on the Legal Effect of the Department's Letter to Price?

Wien's three arguments basically boil down to the proposition that the letter was a ruling which the department could not change retroactively. This basic contention appears to be expressly and directly refuted by the Alaska Net Income Tax Act's incorporation by reference of certain sections of the federal Internal Revenue Code. Specifically, AS 43.20.021(a) provides:

*Subtitle F* [Procedure and Administration] and chapter 1 of subtitle A [Income Taxes] *of the 1954 Internal Revenue Code*, Public Law 83–591, as amended, *are adopted by reference as a part of this*

---

**3.** The state maintains that the department was not indicating an adoption of the binding contract rule in its 1975 letter. While the state's answer to Price's question on the binding contract rule is not perfectly clear, its most reasonable interpretation is that it adopted the binding contract rule:

*Price's Question*:
Are any provisions made for property placed in service after December 31, 1974, but under a contract that was binding at December 31, 1974?
*Department's Answer*:
The State of Alaska will follow the same guidelines as set forth by the Internal Revenue Code for determining the date of acquisition of property for Investment Tax Credit.

*chapter*, except that those provisions of the Internal Revenue Code adopted after December 31, 1975 which change or modify exemptions from tax or credits against tax are not adopted by reference as a part of this chapter until the second January 1 following the effective date of the federal law. *These portions of the Internal Revenue Code have full force and effect under this chapter unless excepted to or modified by other provisions of this chapter.*

(Emphasis added.) [4]

The effect of the incorporation of portions of the federal Internal Revenue Code is further clarified by AS 43.20.300(a):

The provisions of the Internal Revenue Code as now in effect or hereafter amended mentioned in this chapter are incorporated in this chapter by reference and have effect as though fully set out in this chapter.

Included in subtitle F of the federal Internal Revenue Code is the following section:

*Retroactivity of regulations and rulings.*—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

26 U.S.C. § 7805(b) (1976).[5]

In addition, AS 43.20.300(b) provides for the incorporation by reference of Internal Revenue Service rules and regulations relating to adopted sections of the Internal Revenue Code:

When portions of the Internal Revenue Code incorporated by reference as provided in (a) of this section refer to rules and regulations adopted by the United States Commissioner of Internal Revenue, or hereafter adopted, they are regarded as regulations adopted by the department under and in accord with the provisions of this chapter, unless and until the department adopts specific regulations in place of them conformable with this chapter.

Applicable federal regulations outline the various kinds of rulings and determinations issued by the department:

(2) *A "ruling" is a written statement issued to a taxpayer or his authorized representative by the National Office which interprets and applies the tax laws to a specific set of* facts. . . .

. . . .

(5) *An "information letter" is a statement* issued either by the National Office or by a district director *which does no more than call attention to a well-established interpretation or principle of tax law, without applying it to a specific set of facts.* An information letter may be issued when the nature of the request from the individual or the organization suggests that it is seeking general information. . . .

(6) *A "Revenue Ruling" is an official interpretation* by the Service *which has been published* in the Internal Revenue Bulletin. Revenue Rulings are issued only by the National Office and are published for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned.

**4.** This section was added to the Alaska Revenue and Taxation Code earlier in the same session that AS 43.20.036(b), the $500,000 limit on investment tax credits, was added. Ch. 70, § 2, SLA 1975. AS 43.20.021 was also made retroactive to January 1, 1975. Ch. 70, § 15, SLA 1975. Regarding this provision, the governor's transmittal letter to the legislature stated that it "provided . . . a clarification as to the provisions of the Internal Revenue Code which are specifically incorporated." 1975 House Journal 300.

**5.** The "Secretary" referred to in 26 U.S.C. § 7805(b) is the Secretary of the Treasury, who under the Internal Revenue Code is given the responsibility of administering the federal income tax laws. 26 U.S.C. § 7801(a) (1976). Under the Alaska act, the Alaska Department of Revenue is the agency charged with administering the income tax laws. AS 43.20.160(a). Therefore, the "Secretary" in section 7805(b) refers to the Commissioner of the Alaska Department of Revenue under AS 43.20.021(a) which provides that the incorporated sections of the Internal Revenue Code apply as "modified by other provisions of this chapter."

(7) A *"closing agreement,"* as the term is used herein, *is an agreement between the Commissioner* of Internal Revenue or his delegate *and a taxpayer* with respect to a specific issue or issues entered into pursuant to the authority contained in section 7121 of the Internal Revenue Code. Such a closing agreement is based on a ruling which has been signed by the Commissioner or his delegate and in which it is indicated that a closing agreement will be entered into on the basis of the holding of the ruling letter. *Closing agreements are final and conclusive* except upon a showing of fraud, malfeasance, or misrepresentation of material fact. . . .

26 C.F.R. § 601.201(a), (2)–(5) (emphasis added).

The regulations go on to explain the effect of revenue rulings:

(1) *Effect of rulings.* (1) A taxpayer may not rely on an advance ruling issued to another taxpayer. A ruling, except to the extent incorporated in a closing agreement, may be revoked or modified at any time in the wise administration of the taxing statutes. . . . If a ruling is revoked or modified, the revocation or modification applies to all open years under the statutes, unless the Commissioner or his delegate exercises the discretionary authority under section 7805(b) of the Code to limit the retroactive effect of the revocation or modification. The manner in which the Commissioner or his delegate generally will exercise this authority is set forth in this section. . . .

. . . .

(4) A ruling found to be in error or not in accord with the current views of the Service may be modified or revoked. Modification or revocation may be effected by a notice to the taxpayer to whom the ruling originally was issued, or by a Revenue Ruling or other statement published in the Internal Revenue Bulletin.

(5) Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling if (i) there has been no misstatement or omission of material facts, (ii) the facts subsequently developed are not materially different from the facts on which the ruling was based, (iii) there has been no change in the applicable law, (iv) the ruling was originally issued with respect to a prospective or proposed transaction, and (v) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment. . . .

26 C.F.R. § 601.201(k)(2)(1).

In addition, Revenue Procedure 78–24 expressly addresses the effect of published Revenue Rulings:

(1) Rulings and other communications involving substantive tax law published in the Internal Revenue Bulletin are published in the form of revenue rulings. The conclusions expressed in revenue rulings will be directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling. Revenue rulings arise from various sources, including rulings to taxpayers, technical advice to district offices, court decisions, suggestions from tax practitioner groups, publications, etc.

. . . .

(3) A revenue ruling, . . . applies retroactively, unless it includes a specific statement indicating, under the authority of section 7805(b) of the Internal Revenue Code of 1954, the extent to which it is to be applied without retroactive effect. When revenue rulings revoke or modify rulings previously published in the Bulletin, the authority of section 7805(b) ordinarily is invoked to provide that the new rulings will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers. . . . The exercise of this authority requires an affirmative action. . . .

(4) Revenue rulings published in the Bulletin do not have the force and effect

of Treasury Department Regulations (including Treasury Decisions), but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose. No unpublished ruling or decision will be relied on, used, or cited, by any officer or employee of the Service as a precedent in the disposition of other cases.

(5) Taxpayers generally may rely upon revenue rulings published in the Bulletin in determining the tax treatment of their own transactions and need not request specific rulings applying the principles of a published revenue ruling to the facts of their particular cases. However, since each revenue ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same. They should consider the effect of subsequent legislation, regulations, court decisions, and revenue rulings.

Rev.Proc. 78–24, § 7.01.[6]

As for the effect of information letters, a federal ruling notes that they are advisory only and may not be relied upon. Rev.Proc. 80–20, § 19.

In addition to directly adopting certain provisions of the Internal Revenue Code and Regulations by reference, the Alaska Net Income Tax Act states the intent of the legislature that federal judicial and administrative interpretations of federal income tax law be followed: "The department shall apply as far as practicable the administrative and judicial interpretations of the federal income tax law." AS 43.20.160(c).

Two United States Supreme Court cases are on point. First, in *Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), the Court directly ruled on the application of section 7805(b). In that case, 1934 and 1938 rulings that an automobile club was exempt from federal income taxation were revoked by the IRS in 1945 and applied retroactively to 1943 and 1944. After noting that "[t]he doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law," *id.* at 183, 77 S.Ct. at 709, 1 L.Ed.2d at 750 (footnote omitted), the Court held that the Commissioner had not abused his discretion in applying the revocation retroactively. The Court noted:[7] "[I]t is clear from the language of the section and its legislative history that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation or Treasury decision retroactively, but empowered him, in his discretion, to limit retroactive application to the extent necessary to avoid inequitable results." *Id.* at 184, 77 S.Ct. at 710, 1 L.Ed.2d at 750 (footnote omitted). The Court held that there was no abuse of discretion in refusing solely prospective application of the change since the changed ruling applied "indiscriminately" to all automobile clubs. *Id.* at 186, 77 S.Ct. at 711, 1 L.Ed.2d at 751.

Second, in *Dixon v. United States*, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965), the Court held that the Commissioner had not abused his discretion in retroactively withdrawing a published tax court acquiescence. Relying on *Automobile Club of Michigan*, the Court noted: "that the Commissioner is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions. He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake." *Id.* at 72–73, 85 S.Ct. at 1304, 14 L.Ed.2d at 227 (footnote omitted).

---

**6.** *See also* Rev.Proc. 80–20. This procedure provides: "A taxpayer may not rely on a ruling issued to another taxpayer. A ruling, except to the extent incorporated in a closing agreement, may be revoked at any time under appropriate circumstances." *Id.* § 17.01.

**7.** The Court was interpreting current section 7805(b)'s predecessor under the 1939 Internal Revenue Code, former section 3791(b). Former section 3791(b) was substantially identical to current section 7805(b).

Generally, the Internal Revenue Service may make all its rulings retroactive. Only in the application of a revocation of a ruling issued to a particular taxpayer has the service limited its discretion. *Lansons, Inc. v. Commissioner of Internal Revenue*, 622 F.2d 774, 778 (5th Cir. 1980); 26 C.F.R. § 601.201(1). While the service has indicated that, as a practical matter, it will often make published ruling revocations prospective only, Rev.Proc. 78–24, § 7.01(3), it recognizes no obligation to do so. The only circumstances in which the federal courts have found an abuse of discretion in applying rulings retroactively is where a taxpayer has detrimentally relied on the Commissioner's ruling, *Lesavoy Foundation v. Commissioner of Internal Revenue*, 238 F.2d 589, 594 (3d Cir. 1956) (retroactive revocation of a ruling that the taxpayer was an exempt charity would bankrupt it), or where there is a showing of arbitrary and discriminatory application of retroactivity, *International Business Machines Corp. v. United States*, 343 F.2d 914, 923, 170 Ct.Cl. 357 (1965) (ruling change applied retroactively to one competitor and prospectively to another with identical facts); *see* A. Santa Barbara, Internal Revenue Practice and Procedure 43–95 (1977); Comment, *Limits on Retroactive Decision Making by the Internal Revenue Service: Redefining Abuse of Discretion Under Section 7805(b)*, 23 U.C.L.A.L.Rev. 529 (1976); Annot., 1 L.Ed.2d 2051 (1957 & Supps. 1977 & 1980).

Both the federal and Alaska codes make provisions for binding "closing agreements" which are the proper method for obtaining a binding ruling from the department. AS 43.05.060;[8] 26 U.S.C. § 7121 (1976); 26 C.F.R. § 601.202.

In summary, the Alaska Net Income Tax Act adopts the federal regulations defining the effect of various types of department communications with the public. Specifically, "information letters" are advisory only and may not be relied on by a taxpayer. AS 43.20.021(a); 26 C.F.R. § 601.201(a)(5); Rev.Proc. 80–20, § 19. Also, the act adopts the federal statutory, regulatory, and judicial rule on the retroactivity of the tax rulings and regulations. AS 43.20.021(a). Specifically, unless expressly stated otherwise, all rulings and regulations are retroactive. 26 U.S.C. § 7805(b) (1976). The failure to apply a ruling or regulation prospectively is reviewable only as an abuse of discretion, and an abuse of discretion has been narrowly defined to encompass only detrimental reliance on taxpayer's own ruling, resulting in extreme adverse consequences, or discriminatory treatment between two taxpayers with indistinguishable factual situations.

In the present case, we first note that under the regulations the department's letter would be classified as an "information letter," which would be only advisory and not binding on the department. The Price letter to the department requested only general information on Alaska revenue laws to assist the accounting firm in publishing its own commercial tax release. This was not a "ruling" given on a specific set of facts to a specific taxpayer.

Second, even if the letter could be construed as a "ruling," it was properly revoked retroactively. Wien has refused to show any detrimental reliance on the "ruling." Apparently, there is no detriment. Wien simply is liable for its taxes which were due several years ago and must now pay them. Even if Wien had suffered some detriment, it would not be relevant since Wien did not rely on the information letter in deciding whether to purchase the airplanes. The letter was written after the planes were ordered, received, and put in

---

**8.** AS 43.05.060 provides:

The department may enter into an agreement with a person relating to the liability of the person, or of the person or estate he represents, for a tax, license fee, or excise tax for a period ending before the date of the agreement. If the agreement is approved by the attorney general, the agreement is final and conclusive and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact, the case may not be reopened as to the matters agreed upon or the agreement modified. In a suit or proceeding relating to the tax liability of the taxpayer the agreement may not be annulled, modified, set aside, or disregarded.

use. The only use Wien made of the information letter was as a guide to filing its tax forms.

### B.

### Does the Alaska Administrative Procedure Act Require a Different Result?

Wien makes several arguments based on the Alaska Administrative Procedure Act, AS 44.62.010–.650, in an attempt to support its position that the department's letter to Price constituted a binding regulation which could be retroactively revoked by the agency. We find these arguments to be without merit and therefore conclude that the incorporation of federal tax law discussed above is dispositive.

First, Wien relies on the definition of a "regulation" given in Alaska's Administrative Procedure Act in concluding that the department's letter was a binding regulation which the department could revoke only with an order of repeal issued under the APA. AS 44.62.640(a)(2) provides in relevant part:

> "[R]egulation" means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of a rule, regulation, order or standard adopted by a state agency, to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of a state agency; ... "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, which have the effect of rules, orders, regulations or standards of general application, and this and similar phraseology shall not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.

Wien argues that the information letter qualified as a regulation under this definition. It then maintains that although the department failed to properly promulgate the "letter regulation" so as to give it the effect of a valid regulation, the letter should nevertheless be binding on the agency.

In reaching this conclusion, Wien relies chiefly on a series of cases holding that administrative agencies are required to follow internal *procedural* manuals when dealing with the public. Foremost, and typical, among these cases is *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). In that case, the Court held that the agency there involved was required to follow a provision of its internal procedure manual which required publication of "eligibility requirements" for welfare benefits. The Court refused to allow the agency to enforce unpublished "eligibility requirements" that were adopted without compliance with the internal procedure manual. *Id.* at 235–36, 94 S.Ct. at 1074–75, 39 L.Ed.2d at 294.

■ In the present case, while the letter may be a "regulation" as defined by AS 44.62.640 (*see State v. Tanana Valley Sportsmen's Ass'n*, 583 P.2d 854, 858–59 & n.17 (Alaska 1978) (oral instructions by department head regarding standards for issuing hunting permits were "regulations," but were unauthorized and unenforceable since not properly promulgated)), this did not serve to make it binding on the department. Also, *Ruiz* is distinguishable since it involved the failure of the agency to follow internal decision-making procedures, while the current case involves a substantive interpretation of a statute by the department. Therefore, there are no grounds for concluding that the 1975 information letter was a binding regulation under the APA.

Second, Wien contends that the 1980 adjudicatory decision of the department, in which Wien was adjudged liable for the additional taxes, was a legislative "order of repeal" under the APA. AS 44.62.640(a)(1). Wien further contends that since the department's decision did not follow the requirements for promulgating regulations, it was invalid, and the 1975 information letter was controlling authority until properly revoked by an effective order of repeal.

This argument is tied closely to the previous discussion on the binding effect of the letter as a "regulation." Since the letter had no effect as an enforceable regulation, there is no ground for requiring its repeal by an order of repeal. In addition, the 1980 decision in which the department established Wien's liability was an adjudicatory one which simply interpreted the controlling statute. As such, it could properly invalidate a "regulation" which was contrary to the authorizing statute.

Third, Wien argues that since the 1980 decision is really a legislative order of repeal, it cannot be applied retroactively to Wien because AS 44.62.240 provides that only primarily interpretive regulations may be applied retroactively, and then only if there is a consistent prior course of conduct on the part of the agency. Wien avoids the argument that the 1980 decision was an "interpretive regulation" by asserting that, even if it was, the 1975 letter indicated a prior inconsistent interpretation which automatically precluded retroactive application of the 1980 decision.

■ This argument of Wien's also has no basis. The 1980 decision was administrative adjudication, not administrative legislation. While the administrative adjudication provisions of the APA do not apply to the Department of Revenue in income tax matters, AS 44.62.330(20) (under the authority of AS 43.05.010(3), .080.; 43.20.160(c), the department has promulgated its own regulations for adjudication of income tax matters, 15 AAC 05.001–.050), AS 44.62.510(b) sets out the general rule regarding the effect of administrative adjudicatory decisions: "A decision in a primarily judicial proceeding has retroactive effect in the same manner as a decision of a state court."

Therefore, the 1980 adjudicatory decision was properly retroactive.

The decision of the superior court is AFFIRMED.

COMPTON, J., not participating.

RABINOWITZ, Chief Justice, joined by DIMOND, Senior Justice, dissenting.

I dissent from the court's holding that AS 43.20.036(b) does not incorporate the federal binding contract rule.

Prior to 1975, corporate taxpayers in Alaska were allowed investment tax credits authorized under the Internal Revenue Code, 26 U.S.C. § 38, by virtue of the provision of AS 43.20.010(b).[1] In June of 1975, the Alaska legislature enacted AS 43.20.036(b), the statute in question in this appeal, and made it retroactive to January 1, 1975. The portion of AS 43.20.036(b) in controversy in this appeal provides that:

> For purposes of calculating the income taxes payable under this chapter, the taxpayer may apply as a credit against his tax liability, *the job development investment credit allowed as to federal taxes under Internal Revenue Code § 50* upon only the first $500,000 of qualified investment put into use for each taxable year. (emphasis added)

In 1973, Wien contracted to purchase two aircraft and other miscellaneous equipment for approximately $14,132,146. The aircraft were received and placed into service during 1975. If the binding contract rule had been followed then, Wien would have been entitled to calculate its investment tax credit based upon the full value of the aircraft and equipment it had contracted to purchase in 1973 without regard to the new $500,000 limitation.[2] Nevertheless the De-

---

1. AS 43.20.010(b) provided, prior to its repeal in 1975, as follows:

 There is levied and there shall be collected and paid for each taxable year upon the net income of every resident and non-resident corporation that is required to make a return and pay a tax under the federal income tax law a tax equal to 18 per cent of the total income tax that would be payable for the taxable year to the United States at the feder-

al tax rates in effect on December 31, 1963, under the provisions of Chapter 1 of Subtitle A of the 1954 Internal Revenue Code, Public Law 591, 83d Congress, 2d Session, as amended, upon all income derived from sources within the state.

2. The Department of Revenue audited and disallowed the $195,175 investment tax credit taken by Wien in its 1975 tax return to the extent it exceeded $9,000.

partment of Revenue ruled that AS 43.20.-036(b) does not permit investment tax credits for property in excess of $500,000 placed in service on or after January 1, 1975, even if purchased pursuant to a contract which was binding on Wien as of December 31, 1974.

My fundamental disagreement with the majority's analysis of this case centers on the court's conclusion that in enacting AS 43.20.036(b) Alaska's legislature rejected the concept of fairness underlying the federal binding contract rule. I simply cannot ascribe such an unusual intent to our legislature.

As the majority recognizes, the federal binding contract rule is regarded as a rule of fairness.[3] Given the basis for the binding contract rule, I cannot join in the majority's conclusion that in enacting AS 43.-20.036(b) the legislature intended to retroactively repeal the investment tax credits that were authorized at the time Wien made its 1973 investments.

The majority notes that AS 43.20.036(b) expressly provides for incorporation of the federal investment tax credit with a $500,-000 limit. The majority further recognizes that the binding contract rules were part of the federal investment tax credit sections at the time AS 43.20.036(b) was adopted. The court then concedes that it is reasonable to interpret AS 43.20.036(b) as incorporating the federal binding contract rule since the statute appears to incorporate by implication all the federal investment tax credit sections. Despite this concession, the majority rejects this "persuasive" interpretation on the basis of two factors, neither of which I find compelling.

The first factor is that the investment tax credit was limited in order to remove an economic incentive for multi-state business to make investments which qualified for the Alaskan investment tax credit but which provided little benefit to the state of Alaska.[4] In this case, however, Wien had made its purchases in 1973, long before the legislature limited eligibility for the investment tax credit; legislation passed in 1975 could not possibly have provided an incentive or disincentive to the parties to a binding transaction entered into in 1973.

3. Regarding the binding contract rule, I think the following legislative history is significant:

This exception to the general rule is required in fairness to taxpayers who were unaware of the forthcoming suspension of the credit at the time they entered into agreements to construct or acquire property eligible for the investment credit which they cannot now cancel without liability for damages.

S.Rep.No.1724, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 4327, 4343.

Investment plans are made on the basis of the availability of the investment credit and various commitments are then made on this basis. Then, when the credit is suspended, taxpayers are caught in various states of commitment to invest.... [T]he result is the need for a series of special provisions ... which provide for those cases where a facility has not been put in service but there is a substantial commitment for specific investments and where the injury from removal of the credit is substantial.

S.Rep.No. 552, 91st Cong., 1st Sess., *reprinted in* [1969] U.S.Code Cong. & Ad.News 2027, 2261.

4. Apparently the legislature never considered the binding contract rule when enacting AS 43.20.036(b); for the reasons expressed herein I am not prepared to conclude that the legislature would have rejected this eminently fair and reasonable rule had it considered the question which arises in this case—how to treat transactions which were finalized prior to the limitation of the investment tax credit.

In addition, the statutory language itself is obviously ambiguous. First, AS 43.20.036(b) refers to the "job development investment credit under Internal Revenue Code § 50." The Internal Revenue Code contains no provision for a "job development investment credit;" the closest thing to such a credit is the credit for work incentive programs allowed by section 40 of the Code. Second, AS 43.20.036(b) defines the prior reference to the "job development investment credit" to mean the credit allowed by section 50 of the Code. Section 50, however, does not provide for an investment tax credit; that provision merely states the dates on which an earlier provision eliminating the credit became ineffective. Indeed, section 50 was repealed by Congress in 1978, *see* Pub. L.No. 95–600, and this repeal became effective in Alaska on January 1, 1980. *See* AS 43.20.-021. Thus, there is no current limitation on the amount of property which qualifies for the Alaskan investment tax credit if AS 43.20.-036(b) means what it says.

The second factor relied on by the majority is that the legislature's selection of a retroactive effective date for AS 43.20.-036(b), January 1, 1975, is evidence of "the urgency with which the legislature felt that the credit should be eliminated." No legislative history is cited in support of this statement and, in my view, a more plausible explanation for the legislature's choice is that the legislature was aware that most taxpayers file calendar-year tax returns and reasoned that the most convenient effective date would be January 1.

In addition to rejecting the rationales offered by the majority for refusing to recognize the binding contract rule, I believe there are several good reasons to construe AS 43.20.036(b) as incorporating that rule.

First, the investment tax credit was intended by Congress to induce American businesses to make additional investments in productive assets as a means of bolstering a sagging economy.[5] The Alaska legislature apparently believed that this objective was equally applicable to Alaskan taxpayers, for the legislature adopted the federal investment tax credit rules without change. In my view, the legislature, having offered a tax "carrot" to Alaskan taxpayers to induce them to purchase productive assets, was not free to renege on its promise and deny the investment tax credit to taxpayers such as Wien, which had embarked on the very course of action that the investment tax credit was designed to induce.[6]

---

**5.** [A] specific incentive must be provided if a higher rate of growth is to be achieved. The investment credit will stimulate investment, first by reducing the net cost of acquiring depreciable assets, which in turn increases the rate of return after taxes arising from their acquisition. Second, investment decisions are also influenced by the availability of funds. The credit by increasing the flow of cash available for investment, will stimulate investment. The increased cash flow will be particularly important for new and smaller firms which do not have ready access to the capital markets. Third, the credit can be expected to stimulate investments through a reduction in the "payoff" period for investment in a particular asset. This reduction in risk, coupled with the higher rate of profitability and increased cash flow, will lower the level at which decisions to invest are made and will help to restore to past levels the proportion of the annual national output devoted, through investment in machinery and equipment, to capital formation.

The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment. It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy. Only in this way will the investment credit fully serve the overall national interest in greater productivity, a healthy and sustained economic growth, and a better balance in international payments.

S.Rep.No.1881, 87th Cong., 2d Sess., *reprinted in* [1962] U.S.Code Cong. & Ad.News 3304, 3314.

**6.** I am not suggesting that the legislature is not free to repeal or modify a tax advantage previously offered to taxpayers; I am pointing out only that it is fundamentally unfair to offer a specific tax incentive to taxpayers and then to eliminate that incentive retroactively. A retroactive repeal of a tax advantage leaves taxpayers in an impossible position: they are unable to undo that which they did in reliance on the proffered tax benefit. As one commentator observed when discussing a different tax provision than the one at issue in this case:

There is one type of governmental exaction peculiarly unjust, *viz.*, retroactive privilege or excise taxation. The Government must raise funds "to pay the debts and provide for the common defense and general welfare of the United States." Therefore, if, during the existence of an enactment, any person does that which subjects him to a tax, he cannot ordinarily complaint. He goes into the transaction with open eyes. But if, in the absence of statute, he does something not then taxed and afterwards, when he cannot withdraw, Congress retroactively levies an assessment on this completed act, then he may properly feel that he has been unfairly treated. His attorney also finds that advice to his client is of little avail if, after he counsels that a proposed step is tax-exempt, Congress turns back the clock and imposes an excise.

Amberg, *Retroactive Excise Taxation*, 37 Harv. L.Rev. 691, 692 (1924) (footnote omitted).

Second, the language of AS 43.20.036(b) is, at best, ambiguous and, at worst, it fails to achieve the objective of limiting eligibility for the investment tax credit.[7]

Third, shortly after the legislature enacted AS 43.20.036(b), the Department of Revenue took the position that the ambiguous statutory language would be construed to mean that taxpayers who had entered into binding contracts prior to the new limitation on the investment tax credit would be entitled to the tax credit without regard to the limitation. The court agrees that contemporaneous administrative construction is a "valuable aid" in interpreting a statute and I, like Wien, will avail myself of this valuable aid in determining whether the binding contract rule is applicable.

In sum, given the ambiguous language of AS 43.20.036(b) and the manifest unfairness that results from construing this ambiguous provision as rejecting the binding contract rule, I cannot align myself with the majority's position that Wien is not entitled to an investment tax credit for investments in excess of $500,000.