UNITED STATES of America, Plaintiff–Appellee,

v.

Mohammed Farhad KHORRAMI, Defendant–Appellant.

No. 88–3258.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1989.

Decided Feb. 16, 1990.

Paula E. Lopossa, Asst. U.S. Atty., Office of the U.S. Atty., and Susan Heckard, Indianapolis, Ind., for plaintiff-appellee.

Steven J. Glazier, Mantel, Cohen, Garelick, Reiswerg & Fishman and Richard L. Darst, Indianapolis, Ind., for defendant-appellant.

Before CUMMINGS and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Defendant-appellant, Mohammed Farhad Khorrami, appeals from convictions for mailing threatening communications, in violation of 18 U.S.C. §§ 876 and 3237(a) and of making annoying, threatening or harassing telephone calls in violation of 47 U.S.C.

§ 223(a)(1)(B). Each of the defendant's convictions stem from communications he directed to the headquarters of the Jewish National Fund in New York City, New York. We affirm.

## I

In early 1988, a series of harassing and threatening phone calls and letters were received at the New York headquarters of the Jewish National Fund. The Jewish National Fund (JNF or Fund) is a non-profit organization that raises funds for planting trees, building roads and erecting recreational facilities in the nation of Israel. The Jewish National Fund is also responsible for all open land fire fighting in the nation of Israel.

The Jewish National Fund maintains a toll-free number at its New York, New York headquarters where interested individuals may direct donations and information requests. In the summer of 1987 the Jewish National Fund's toll-free number began to receive harassing and threatening phone calls. In the beginning, these calls were received on an average of once a week, but as of November 1987 these phone calls were received nearly every other day. The phone calls consisted of repetitive anti-Semitic comments and profanity. As a reaction to this series of telephone calls and to permit the Jewish National Fund to record information requests and donations during hours its switchboard was closed, the Jewish National Fund purchased a telephone answering machine in November 1987.

On January 11, 1988, Melanie Baker, the individual who supervises and coordinates the Jewish National Fund's toll-free telephone number and Jaime Negroni, an employee who works in Baker's telemarketing, communications and information department, listened to a telephone answering machine tape on which they heard an irate individual making threatening and profane statements concerning the Jewish National Fund, Israelis, and Jews. Upon hearing the tape, Negroni took the tape to Michael Aschenbrand, the Jewish National Fund's Director of Administrative, Personnel and Security Services. Aschenbrand turned the tape over to the New York Police Department and instructed Negroni to record all incoming messages, rather than just those received after hours and on weekends. During the week of January 11–15, 1988, threatening telephone calls were received on both January 12 and 13, 1988.

On the weekend commencing Friday, January 15, 1988, the Jewish National Fund's toll-free number received two recorded telephone calls from a male individual that were similar to those it had received previously. The calls were quite lengthy and involved statements in which the caller stated "death to" Jews, various individuals, and the Jewish National Fund. The callers also stated "long live," Palestine, Hitler and others. The caller also spewed forth other vicious, degrading and random insults including statements that "Jews are scum," as well as profane statements such as "Fuck all Jews." After having received these calls, the Jewish National Fund stopped recording telephone calls for about a month, but resumed recording in February 1988. Thereupon, the Fund received calls of the same threatening style and format on February 20, March 4 and April 23 and 24, 1988.

The individuals who received the telephone calls at the Jewish National Fund properly perceived the calls as threatening. Michael Aschenbrand noted that he felt the calls were serious threats because he had received bomb threats previously and was aware of the fact that many of the forest fires that were fought in Israel were set through arson. Melanie Baker felt threatened because the caller's statements such as "death to all Jews," the repetitive nature of the calls, the obscenities and the death threats to various officials scared her. Jaime Negroni stated that he considered the telephone calls threatening in light of the facts that he worked for the Jewish National Fund, the extent of anti-Semitism in the world today and the presence of world terrorism and the tensions in the Middle East.

On February 12, 1988, the Fund received a mailing in one of its postage paid "business reply envelopes" that had been sent to the attention of Melanie Baker and was postmarked "Bloomington, Indiana, February 9, 1988." This envelope contained a poster-like paper that stated at its top "Wanted for crimes against humanity and Palestinians for fifty years." Under this heading the paper contained pictures that had been taken from materials that the Jewish National Fund published. The pictures were of Israeli officials including Yitzhak Shamir, Israeli Prime Minister, Shimon Peres, Israeli Foreign Minister, Chaim Herzog, Israeli President, Teddy Kollek, Mayor of Jerusalem and Shlomo Lahat, Mayor of Tel Aviv. Also included on the paper were pictures of Thomas Pickering, former United States Ambassador to Israel as well as of individuals who were the President, Executive Vice–President and Director of Communications for the Jewish National Fund. Swastikas and epithets were drawn over the pictures together with "mustaches" and other disfigurements. Next to the names Yitzhak Shamir and Shimon Peres were, respectively, the words "Execute now!" and "His blood need." Next to the pictures of both Teddy Kollek and Shlomo Lahat were the statements "Must be killed." On the left side of the picture was a map of Israel on which was written "Long live Palestine," and a small disfigured picture of an individual appearing to be Senator Edward Kennedy with an arrow pointing to an accompanying statement "Long live Sarhan Sarhan." (sic).[1]

Around the same time the Jewish National Fund received the envelope containing the "wanted" poster, it received another envelope postmarked "Bloomington, Indiana, February 9, 1988." This envelope was addressed to "Zionist and Outlawed Fund," and was given directly to Jewish National Fund Security Director, Michael Aschenbrand, after it was received in the Fund's mail room. The envelope contained a copy of the Jewish National Fund Mission's Calendar. The material on the calendar was crossed out, and swastikas were inserted. Also written on these calendars were typewritten statements with anti-Semitic content, as well as obscene, vicious and indecent language similar in content to the statements made in the phone calls previously received at the Jewish National Fund headquarters. Some of the statements included were "Death" to the "occupiers of beloved Palestine," to "Congress," to "Ronald Reagan," "Shamir," and "to the Fucking JNF." Also in a manner reminiscent of the phone calls, were statements noting "Long live": "the beloved Iranians," "the beloved PLO," and "his holiness Khomeinee, the only leader of the free world."

Reacting to the receipt of these documents, the Jewish National Fund implemented several proper investigative measures. Initially, the mailings received from Bloomington, Indiana were turned over to the New York Police Department on February 17, 1988. Secondly, since the mailings contained materials taken from Jewish National Fund information packets, Security Chief Michael Aschenbrand instructed Jaime Negroni of the JNF's Communications Department to ascertain if the JNF had mailed materials to individuals in Bloomington, Indiana. Negroni looked through the records and discovered a request for an information packet from a "David Stein" of Bloomington, Indiana. On February 17, 1988, Negroni made two telephone calls to the number that had been listed on the David Stein information request. In the first telephone call, Negroni heard an individual answer the telephone with the words "Financial Services of America." Based upon his previous exposure to the series of threatening telephone calls the Jewish National Fund office had received and upon his training in the armed services in listening for sounds in the context of submarine and sonar devices, Negroni immediately recognized the voice of the individual who answered the telephone as that of the same person who had made the series of threatening telephone calls to the Jewish National Fund. Negroni asked if he could speak to David Stein, whereup-

---

1. Sirhan Sirhan, of course, is the convicted as-

sassin of former Senator Robert F. Kennedy.

on the party with whom he was speaking hung up the telephone. When Negroni called the same number two minutes later, he heard a recording that stated that he was speaking with Financial Services of America.

Telephone records revealed that the Bloomington, Indiana, telephone number that Negroni called on February 17, 1988, was subscribed in the name of Farhad Khorrami. Telephone records received in evidence reflected that there had been frequent calls directed from this number to the Jewish National Fund toll-free telephone number. These included 14 calls on January 8, 1988, one call on January 9, 1988, one call on January 10, 1988, 16 calls from January 11 to January 14, 1988, and five calls on January 15, 1988.

Other evidence was received that also linked Khorrami to the letters sent to the Jewish National Fund that were postmarked in Bloomington, Indiana, on February 9, 1988. Initially, James E. Winand, a United States Secret Service Qualified Documents Examiner, testified that his analysis of the handwriting in both of the letters the Jewish National Fund received, led him to the conclusion that it was "highly probable" that both exhibits were written by Khorrami. Winand's analysis of the typing found on the altered Jewish National Fund mission calendars sent to the Fund, led him to the conclusion that the typed matter had come from Khorrami's word processor. In addition, fingerprint analysis conducted by United States Secret Service Fingerprint Specialist Bobby Ratliff confirmed that Khorrami's fingerprints were found on the altered Jewish National Fund mission calendar that had been sent to the Fund. Finally, pictures seized at Khorrami's residence at the time of his arrest contained alterations quite similar to those found in the "wanted" poster the Jewish National Fund had received.

At trial Khorrami denied that he had made the telephone calls, claiming that another individual must have entered his residence without his knowledge or consent to make these calls. Furthermore, Khorrami stated that he had examined the Mission Calendar on which his fingerprints appeared, but had not done anything more with this material as it had been addressed to another individual. He denied that he had mailed an altered copy of this calendar.

Following a jury trial, Khorrami was convicted of two counts of placing anonymous, annoying, threatening, abusive and harassing phone calls to persons at the Jewish National Fund in violation of 47 U.S.C. § 223(a)(1)(B) and one count of mailing a communication threatening to kill individuals in violation of 18 U.S.C. § 876. The court sentenced Khorrami to concurrent sentences of three years' imprisonment for mailing threatening communications and concurrent six months' imprisonment for each count of making obscene or indecent telephone calls. The court suspended all of the sentences of imprisonment and substituted sentences of probation for the same length of time. Terms of the probation were that Khorrami reside at the Volunteers of America in Indianapolis for a period of 15 months, make an effort to obtain employment to repay the cost of his stay at the Volunteers of America, and seek and participate in weekly mental health counseling.

## II

Khorrami alleges that the evidence was insufficient to support his conviction for mailing a threatening communication in violation of 18 U.S.C. § 876. "In evaluating [Khorrami's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct.

2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

"As we emphasized in *United States v. Giangrosso*, 779 F.2d 376, 382 (7th Cir. 1985): *'[T]his court is not the trier of fact and we are required to uphold the [trier of fact's] verdict where "any rational trier of fact" could have found the defendant guilty of the crime.'* ... *'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.'* Nesbitt, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988), which quoted, in turn, *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)."

*United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988).

A jury may properly rely upon circumstantial evidence in convicting a criminal defendant. As we observed in *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989):

" 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). ' "Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also* Wisconsin Jury Instructions—Criminal, No. 170 ('[C]ircumstantial evidence may be stronger and more convincing that [sic] direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v.*

*Thornley*, 707 F.2d 622 (1st Cir.1983)).' [*United States v. Koenig*, 856 F.2d 843, 856 (7th Cir.1988)]."

In weighing both direct and circumstantial evidence

"[Triers of fact] are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt*, 852 F.2d at 1511. Not only do we recognize the trier of fact's experience in the affairs of life, we also acknowledge the trier of fact's role as the arbiter of credibility:

"[W]e defer to the [trier of fact's] determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the [trier of fact] and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir. 1985)."

*Vega*, 860 F.2d at 794.

We have recognized "that there are two essential elements to prove a violation of 18 U.S.C. § 876, *viz.*, (1) that the defendant wrote a letter addressed to a certain person containing a threat to injure the person of the addressee or of another, and (2) that the defendant knowingly caused the letter to be forwarded by United States mail." *United States v. Reynolds*, 532

F.2d 1150, 1155 (7th Cir.1976).[2] On appeal Khorrami does not contest the fact that he authored the allegedly threatening letter. Indeed, it would be most difficult for Khorrami to take a contrary position as handwriting analysis demonstrated that it was "virtually certain" that his handwriting was found on the allegedly threatening "wanted poster" letter. Moreover, the second letter postmarked Bloomington, Indiana, that was sent on the same day as the "wanted poster" letter, contained type generated from Khorrami's word processor and displayed Khorrami's fingerprints. In addition, both of the letters utilized materials that had been sent from the Jewish National Fund, and a call to the telephone number of an individual who had requested Jewish National Fund materials turned out to be a call to Khorrami's telephone. Because Khorrami's authorship of these letters is essentially undisputed, as in *United States v. Hoffman*, 806 F.2d 703, 712 (7th Cir.1986), "the only question presented is whether the government produced evidence sufficient to support the jury's verdict that [Khorrami's] letter constituted a 'true threat.'"

■ The necessity to resolve the question of whether Khorrami's letter constituted a "true threat" stems from the protections our Constitution accords free speech. In *Hoffman*, a case involving the construction of a similar statute that prohibited threats upon the President (18 U.S.C. § 871(a)), we stated that:

> "In *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court cautioned that because a statute 'makes criminal a form of pure speech, [it] must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.' *Id.* at 707, 89 S.Ct. at 1401. The Court construed the stat-

ute 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *Id.* at 708, 89 S.Ct. at 1401. To protect these First Amendment values, the Court held that 'the statute requires the government to prove a true "threat."' *Id.* The Court concluded that 'political hyperbole' does not constitute a 'true threat.' *Id.*"

*Hoffman*, 806 F.2d at 706.

> "Thus, in order for the government to establish a 'true threat' it must demonstrate that the defendant made a statement
>
>> 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [another individual].'"

*Hoffman*, 806 F.2d at 707 (quoting *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969)). As the Eighth Circuit noted in *Martin v. United States*, 691 F.2d 1235, 1240 (8th Cir.1982), a case that construed 18 U.S.C. § 876, the statute involved in our case: "The question of whether the language constitutes a threat is an issue of fact for the jury. If a reasonable recipient, familiar with the context of the communication, would interpret it as a threat, the issue should go to the jury." (Citations omitted). In demonstrating a "true threat" "the government is not required to establish that the defendant actually intended to carry out the threat." *Hoffman*, 806 F.2d at 707. In addition, "corroborating evidence that the defendant had the ability to

---

**2.** Some courts have held that it is unnecessary for the government to demonstrate that the defendant authored the threatening letter himself. *United States v. Bloom*, 834 F.2d 16, 18–19 (1st Cir.1987); *United States v. Stotts*, 792 F.2d 1318, 1323–24 (5th Cir.1986). We need not resolve the question of whether authorship is an essen-

tial element of a violation of 18 U.S.C. § 876 because, as will be clear in our discussion of the proof the government presented, the evidence was clearly sufficient for a reasonable jury to conclude that Khorrami authored the alleged threatening communications.

carry out the threat is not a requirement to establish a 'true threat'...." *Id.* at 708.

Khorrami's argument is that the "wanted" poster he sent to the Jewish National Fund that contained the words "Execute now" next to a picture of Yitzhak Shamir and "His blood need" next to a picture of Shimon Peres, together with disfigured pictures of other Israeli officials, American officials and officers and employees of the Jewish National Fund, was merely "political hyperbole" and could not have been interpreted by a reasonable jury as containing "true threats."

In *Hoffman* we emphasized the importance of the context of a statement in determining whether it is a true threat or merely political hyperbole. 806 F.2d at 707. We examined whether the statement was made " 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of [another individual].' " *Hoffman,* 806 F.2d at 707 (quoting *Roy v. United States,* 416 F.2d 874, 877 (9th Cir.1969)). Khorrami sent the "wanted poster" to the Jewish National Fund following a six-month campaign of profane, vulgar and vicious telephone calls to the Fund's toll-free number. He sent the poster at the same time that he also sent another threatening letter to the Fund. Khorrami drafted all of his threatening correspondence from Jewish National Fund materials, demonstrating to the Fund employees that they were dealing with an individual who had previous contact with the Fund, and he included threats against Fund officers on the same poster that contained threats to Shimon Peres and Yitzhak Shamir. Later, Jaime Negroni, a Fund employee, reasoned that it was likely that the letters and the harassing telephone calls were coming from the same individual. In the context of Khorrami's personal vendetta campaign of telephonic and postal harassment waged against the Jewish National Fund, a reasonable jury could conclude that the recipients of Khorrami's "wanted" poster would interpret this poster as a serious threat to inflict bodily harm upon another rather than as mere "political hyperbole." Since there was more than sufficient evidence to support the jury's conclusion that Khorrami's "wanted" poster constituted a "true threat," Khorrami's conviction must be upheld.

### III

Khorrami, arguing for reversal of his convictions, alleges that the district court improperly admitted tapes of harassing telephone calls Khorrami allegedly made to the Jewish National Fund that were not a part of his indictment. The tapes of these conversations were conditionally admitted for the purposes of establishing the content of the threatening telephone messages relevant in demonstrating that Khorrami's telephone calls and written communications contained "true threats," Khorrami's identity, as well as his intent. The district court allowed the jury to hear segments of the taped conversations conditioned upon the government later establishing that the calls came from Khorrami. In the event this identification was not established, the district court stated that the tapes would be subject to being stricken from the record. The judge when requested at trial admitted four of five of the tapes to which Khorrami objected, but never received the fifth tape. Khorrami alleged that the admission of the four tapes in evidence, as well as the playing of the fifth tape to the jury not formally admitted in evidence, violated Rules 403 and 404 of the Federal Rules of Evidence. He contended that the tapes were not relevant because the statements did not take place on the January 15 date of the charged threatening phone call, that they were not admitted for purposes recognized under Rule 404(b), that Khorrami was insufficiently identified as the caller and that the unfair prejudicial impact of these calls outweighed their probative value.

The trial court's admission of this evidence under Rules 404(b) and 403 is governed by the four-part test outlined in

*United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984):

> "Our decisions indicate that, under the dictates of Rule 404(b) and 403, admission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue (i.e., such that 'the consequential fact may be inferred from the proffered fact' 2 J. Weinstein and M. Berger, *Weinstein's Evidence* § 404(a) at 404–49 (1982)), (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."[3]

In *United States v. Connelly,* 874 F.2d 412, 415 (7th Cir.1989), we recently observed:

> "We will reverse a trial court's admission of evidence under Rule 404(b) 'only upon a clear showing of abuse of discretion.' *United States v. Brown,* 688 F.2d 1112, 1115 (7th Cir.1982). 'Our role on review is not to second-guess the results reached by the trial court in applying the *Shackleford* standards.' *United States v. Hudson,* 843 F.2d 1062, 1065 (7th Cir. 1988). Moreover, '[i]n reviewing the admissibility of relevant, potentially prejudicial evidence,' this circuit 'view[s] the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing the prejudicial effect.' *Brown,* 688 F.2d at 1117."

We have little difficulty with the admission of the tapes of conversations that allegedly took place on January 12, 1988, January 13, 1988, and February 20, 1988. With respect to Khorrami's objection concerning the date of these calls, we note that the calls were not admitted to establish three separate and independent annoying and harassing telephone calls pursuant to 47 U.S.C. § 223(a)(1)(B) but were received to demonstrate a continuous pattern of telephone calls, threatening in nature, and relevant as to both Khorrami's identity and his intent. The January 12 and 13 telephone calls were made within a few days of the charged January 15 telephone call and within a month of the Jewish National Fund's receipt of the threatening correspondence. Similarly, the February 20 telephone call was made shortly after the Fund had received threatening correspondence. These calls were, thus, relevant to establish for the jury the pattern of anti-Semitic telephone calls made by a person with the same voice inflections and accent the Jewish National Fund had been receiving during the particular time frame it received the charged threatening telephone calls and letters. Telephone toll records established that telephone calls had been made from Khorrami's residence on each of these dates and helped provide "sufficient evidence" to support the jury's findings that Khorrami had made these telephone calls.[4] In addition, each of these three telephone calls were made by a person with the same voice pattern making the same type of anti-Semitic statements, thereby helping to establish both the identity of Khorrami as the person placing the charged January 15 telephone call as well as the intent of the caller. Furthermore, Jaime Negroni, a JNF employee, called Khorrami's telephone number in February 1988 and testified that the voice of the person answering this call "was the same voice that had been calling" the JNF in the previously recorded threatening calls.[5] In

---

3. As we have observed, the "Supreme Court recently lowered the *Shackleford* standard requiring 'clear and convincing' proof that the defendant committed the similar act, holding that similar act evidence should be admitted if there is 'sufficient evidence' to support a finding by the jury that the defendant committed the similar act. *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988)." *United States v. Connelly,* 874 F.2d 412, 415 n. 5 (7th Cir.1989).

4. In light of the toll records, Khorrami did not strongly urge objections based upon the alleged lack of identification concerning the January 12, January 13 and February 29, 1988, telephone calls.

5. Negroni had acquired a certain knowledge through training and experience in distinguishing sound pitches while a member of the U.S. Navy, and Negroni was also a communications major in college. As part of his job responsibili-

light of the clearly relevant nature of Khorrami's statements, the well-thought-out limitations placed on the playing of the tapes to the jury, as well as the requirement that we "view the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing the prejudicial effect," *Brown*, 688 F.2d at 1117, we conclude that the trial court properly exercised its discretion in receiving the tape recordings of the January 12, January 13 and February 20 telephone calls Khorrami allegedly made to the Jewish National Fund.

■■■ The tape of the telephone call of March 4, 1988, was also relevant to Khorrami's identity and intent for the same reasons as was the telephone call of February 20, 1988. As was the case with the February 20 tape, the receipt of the March 4 tape did not unfairly prejudice Khorrami as only the pertinent segment of the tape containing the same type of profane and threatening statements as in the charged letters and telephone calls was played for the jury, and the tape was sufficiently close in time to Khorrami's charged crimes to establish relevance thereto. However, unlike the telephone calls previously discussed, the March 4, 1988, telephone call was not reflected in the telephone toll records for Khorrami's telephone. Nonetheless, we do not believe that there was an abuse of discretion in admitting this tape in evidence because the average juror, after having heard a number of tapes containing the same voice pattern and the same profane and threatening statements as those found on the March 4, 1988, tape, could compare the March 4 tape to those upon which telephone records verified origination from Khorrami's telephone and properly conclude that Khorrami made the involved telephone call. Furthermore, Jaime Negroni had testified that the party he spoke with at Khorrami's telephone number on

February 17, 1988, displayed the same voice patterns as that received on the tapes he had heard previously. Thus, we refuse to hold that it was error for the trial court to receive this evidence.

■■■ Khorrami also alleges that his convictions must be reversed because the trial court played for the jury parts of an April 23 or 24, 1988, taped telephone call that was conditionally, but never formally, received in evidence.[6] Khorrami objects to the admission of this tape on the grounds that the tape was insufficiently identified, recorded a conversation that was not charged in the indictment and states that its prejudicial effect outweighed its probative value. This tape, like the other tapes, was conditionally admitted into evidence early on in the trial subject to the introduction of subsequent evidence identifying Khorrami's voice on the tape. No motion was ever made after the receipt of the other tapes to have this tape dated April 23 or 24 received in evidence or stricken from the record, nor was any request made to have the court instruct the jury to disregard the same. We are convinced that the reception of the three similar tapes in evidence that were clearly identified as originating from Khorrami's telephone number, together with the jurors' ability to compare the similarities in voice patterns, tones and inflections with the voice patterns, tones and inflections on the tapes that were admitted into evidence, as well as the similar profane, anti-Semitic statements in each call, overcomes any problems associated with Khorrami's objection regarding the identification of his voice on this tape. The reception of other tapes similar in context and voice pattern further demonstrates that the playing of a segment of this tape for the jury had no prejudicial impact and we hold this tape was merely cumulative of the other (taped) evidence previously received. This tape was merely

---

ties, Negroni had heard the tapes of Khorrami's allegedly threatening phone calls that took place prior to his call to Khorrami's telephone numbers.

**6.** April 23 and 24, 1988, were weekend days (Saturday and Sunday) when the JNF offices

were closed. Thus, because of the type of tape recorder used that did not record the date of the calls, it could not be determined on which of these two dates the taped conversations took place.

another piece of evidence to be considered by the jury in establishing Khorrami's identity as well as the intentional threatening nature of his conduct. Thus, we are convinced that the probative value of this tape outweighed any possible prejudicial impact. Furthermore, counsel for both the government and the defendant have a duty to call to the district court's attention the court's duty to rule on the admission of any piece of evidence left undecided as to its reception, including this tape at the close of evidence prior to the jury's receipt of this case. The failure of the objecting counsel to timely request a ruling on the admission or striking of the tape prior to the jury's receipt of the case, in order to have this evidence stricken from the record or an instruction for the jury to disregard, certainly does not add to his argument for reversible prejudicial error.

Nonetheless, had we determined that the court erred, which we did not, we note that even errors of a constitutional magnitude will not justify a reversal if they are harmless beyond a reasonable doubt. As the Supreme Court noted in *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986): "[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." In this case there was overwhelming evidence, including long distance toll records, that established that Khorrami made the harassing telephone calls of January 15, 1988, and that Khorrami wrote the threatening letter the Jewish National Fund received in February 1988. In light of the totality of this evidence, together with the reception of other similar tapes containing the same voice patterns making the same threatening, profane, anti-Semitic statements, we are convinced that the playing of a small part of one allegedly threatening taped conversation recorded after the dates of the Jewish National Fund's receipt of the charged threatening telephone calls and correspondence

that had been conditionally admitted into evidence was harmless beyond a reasonable doubt.[7]

Because there was more than sufficient evidence to conclude that Khorrami sent a threatening communication to the Jewish National Fund and because there was no reversible error in the trial court's handling of the taped telephone conversations the government presented, the district court's judgment is

AFFIRMED.

---

7. We also believe that if there was error in the receipt of any of the other tapes into evidence, it

would have been, at best, harmless for the reasons enumerated.