Victor Z. POWELL, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–7114, A–7143.

Court of Appeals of Alaska.

Nov. 9, 2000.

Philip M. Pallenberg, Assistant Public Defender, Juneau, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

The superior court and the district court revoked Victor Z. Powell's probation because Powell wrote three letters from prison about his upcoming release to a Juneau halfway house. The superior court concluded that these letters contained threats to inflict phys-

ical harm, and that Powell committed third-degree assault[1] and coercion[2] by sending the letters. The district court relied on the superior court's decision and also revoked Powell's probation. Because we conclude that the letters do not support the elements of coercion or third-degree assault, we reverse the judgments of the superior and district courts.

Powell was on probation in four felony cases that arose in Fairbanks and a misdemeanor case that originated in Juneau. As a result of this Juneau case, Fairbanks Superior Court Judge Niesje J. Steinkruger revoked Powell's probation on the felony cases, imposed some suspended imprisonment, and continued Powell's probation on various conditions including a condition that Powell reside in a community rehabilitation center or halfway house for up to eight months upon his release from incarceration. Venue for the Fairbanks cases was changed to Juneau at some time because Powell resided in Juneau and was supervised by the Juneau probation office.

Powell wrote four letters from prison while he was serving the term revoked by Judge Steinkruger: (1) a September 10, 1997, letter addressed to the halfway house, which was received by Andy Swanston, the Operations Director of Gastineau Human Services Corporation, which runs the Glacier Community Rehabilitation Center (CRC) in Juneau; (2) a September 28, 1997, letter addressed to the CRC, which was also received by Swanston; (3) an October 19, 1997, letter addressed to Gastineau Human Services, which was also received by Swanston; and (4) an October 27, 1997, letter addressed to Southeast Rehabilitation Services, which was forwarded to Gastineau Human Services and was received there by Swanston. In the letters, Powell discussed his criminal and juvenile history and expressed dissatisfaction with the condition that he live in the CRC for eight months after his release from incarceration.

After receiving the letters, Swanston called Powell's probation officer, Betty Tangeman, and told her about the letters and that Tangeman was mentioned in them. Swanston advised that he would probably not ac-cept Powell at the CRC because he perceived the letters to be threatening. On November 6, 1997, Swanston sent a letter to the State and advised that Powell would not be accepted at the CRC because of the letters.

On February 1, 1998, Probation Officer Tangeman filed a petition to revoke Powell's probation in the four Fairbanks felony cases. The original petition alleged that Powell had violated the special condition of his probation to live in a halfway house by writing the letters that ultimately resulted in Swanston declaring him ineligible to enter. On February 18, 1998, Powell moved to dismiss Tangeman's petition to revoke, arguing that (1) his probation could not be revoked before it started; (2) the probation condition was an illegal delegation of the court's sentencing authority; and (3) the letters he wrote were constitutionally protected free speech for which his probation could not be revoked. On February 19, 1998, Tangeman filed an amended petition to revoke, adding the allegation that Powell had committed third-degree assault and coercion by sending the letters.

In the first letter, dated September 10, 1997, Powell indicated, among other things, that: (1) when he was twelve years old he had burned down a set of ATCO trailers like the one used at the CRC for urinalysis testing and had burned down another structure; (2) he does not "like fire in itself, [he] just like[s] revenge . . . and when [he] get[s] angry . . . [he] find[s] a way to vent [his emotions] . . . [to get] attention"; (3) he had committed other destructive and violent acts; (4) he had decided that he would not be "going back to jail alive" and had obtained weapons and "cop killer" bullets to make sure he did not; (5) he wrote the letter "to help us have an understanding why [he's] the way [he is] today . . . [that] all [he] had was [his] baby boy, . . . wife and daughter, . . . but now . . . all that will be gone including [his] home so [he] will be sexually frustrated[,] pissed off[,] and ready to have a good time with [our] new relationship"; (6) inquired if the CRC had insurance for arson; and (7) stated that all of this was coming "right to [the CRC's] doorstep!"

---

**1.** AS 11.41.220(a)(2).

**2.** AS 11.41.530(a)(1).

In the second letter, dated September 28, 1997, Powell stated, in relevant part that: "I shall never again be imprisoned .... [a]s soon as I finish my business, I'm busten ass for parts unknown. Till then, I'm as dangerous as a coral snake in a sleeping bag. 'Never corner a frightened man.'"

In the third letter, dated October 19, 1997, Powell: (1) stated "I am not in any way attempting to horass [sic], scare or cause you any discomphert [sic]. I'm merely attempting to gain some understanding on why I should be allowed in you[r] pleasant establishment with my record and knowing you have nothing to offer me that I don't already have"; (2) repeated the description of his history that he had written in his September 10 letter; (3) stated that "[m]y personality disorder was diagnosed as sociopathic traits. I am now what the system conciders [sic] a danger to myself and you guys not because I may snap, but because I am a manipulator and I have impulsive behaviers [sic]"; (4) indicated that he still had a number of guns "stashed"; (5) stated that if he lost his home and family he would have "nothing to live for an[d] no [qualms] about who [he] hurt[s] or how [he] act[s]."

In the letters, Powell expressly denied that they were intended as threats. The State argues that Powell's denial was an indication that he knew the letters could be understood as threats and underscores the threatening nature of the letters.

The superior court cases were assigned to Superior Court Judge Walter L. Carpeneti for adjudication on the petition to revoke probation. On March 10, 1998, Judge Carpeneti conducted an evidentiary hearing at which Swanston and the probation officer to whom Swanston forwarded the letters testified. Judge Carpeneti entered a written order of adjudication. Judge Carpeneti dismissed the first allegation of the amended petition on the grounds that (1) the special condition of probation could not be violated before Powell's probation commenced, and (2) the condition was an illegal delegation of the court's sentencing authority. Judge Carpeneti found that (1) Powell had written the letters; (2) the letters intentionally contained threats to cause death or serious physical injury; (3) the letters were designed to compel Swanston to disqualify Powell for admission into the CRC; and (4) the letters did compel that result. Judge Carpeneti found that the State had proven that Powell committed third-degree assault and coercion and revoked Powell's probation. Judge Carpeneti also found that revoking Powell's probation did not violate his constitutional rights to free speech. At disposition, Judge Carpeneti imposed Powell's suspended imprisonment.

Powell and the State agreed to accept Judge Carpeneti's adjudication on the felony petition for purposes of the Juneau misdemeanor case. Judge Froehlich agreed that the letters constituted violations of law and revoked Powell's probation. Judge Froehlich imposed Powell's suspended imprisonment concurrent with the felony cases.

*Discussion*

We review a trial court's factual findings regarding a probation revocation for clear error.[3] On questions of statutory interpretation, we exercise independent judgment.[4]

First, Powell claims that the coercion statute is overbroad. Powell cites to an Oregon case, *Oregon v. Robertson,*[5] that held on Oregon state constitutional grounds that the Oregon coercion statute that was practically identical to the Alaska coercion statute was unconstitutionally overbroad.[6] The *Robertson* court concluded that it could not exercise its power to give a limiting construction to the statute that would save its constitutionality without running afoul of the legislative intent.[7]

Alaska Statute 11.41.530(a)(1) provides that a person commits coercion

if the person compels another to engage in conduct from which there is a legal right to abstain or abstain from conduct in which there is a legal right to engage, by means of instilling in the person who is compelled

---

**3.** See *Andrew v. State,* 835 P.2d 1251, 1256 (Alaska App.1992).

**4.** See *Conner v. State,* 696 P.2d 680, 682 (Alaska App.1985) (citing *Wien Air Alaska, Inc. v. State, Dep't of Revenue,* 647 P.2d 1087 (Alaska 1982) and *Francis v. Anchorage,* 641 P.2d 226 (Alaska App.1982)).

**5.** 649 P.2d 569 (Or.1982).

**6.** See *id.* at 589–90.

**7.** See *id* at 576, 590.

a fear that, if the demand is not complied with, the person who makes the demand or another may inflict physical injury on anyone ... or commit any other crime[.]

However, to prove this count of the probation revocation, the State was required to prove that Powell compelled someone to act or to refrain from acting in the face of a demand from Powell that if Powell's demand was not complied with, Powell would inflict physical injury on someone or commit some other illegal act.

We conclude from our independent examination of Powell's letters they do not contain any explicit demand for specific action or restraint from action on the part of anyone at the CRC. Furthermore, the State did not argue nor did the superior court find that any of the three letters that formed the basis of the coercion claim contained an implicit demand that anyone at the CRC should act or refrain from acting in a specific way. Because the court did not find that the State proved the element of a demand from Powell, the court's adjudication that Powell violated his probation by committing coercion must be reversed. Because the court did not find that the State proved an essential element of coercion, we need not pass on Powell's claim that the coercion statute is overbroad.

■ Next, we must consider Powell's challenge to the superior court's conclusion that he committed third-degree assault under AS 11.41.220(a)(2). Alaska Statute 11.41.220(a)(2) provides that a person commits third-degree assault if the person "with intent to place another person in fear of death or serious physical injury to the person or the person's family member makes repeated threats to cause death or serious physical injury to another person."

We first consider whether this statute is overbroad. Courts have consistently recognized that statutes proscribing threats of death or physical injury are not overbroad on their face.[8] Here, the State has a strong and legitimate interest in preventing a person from causing another to fear serious physical injury or death. This interest is a main foundation for both the third- and fourth-degree assault statutes. And this interest substantially outweighs the potential risk that the statutory language might, in some situations, extend to legitimate speech. Because this balance clearly favors the State's interest in protecting against the unjustified creation of the fear of death and serious physical injury, we conclude that the AS 11.41.220(a)(2) is not invalid on its face.

■ In *Watts v. United States*,[9] the United States Supreme Court emphasized that "[w]hat is a threat must be distinguished from what is constitutionally protected speech" when deciding if a facially valid statute prohibiting threats is valid as applied to a specific case.[10] The Supreme Court thus imposed upon the prosecution the burden of proving a "true threat."[11] Although the Supreme Court did not define what constitutes a true threat for purposes of this analysis, other courts have. For example, in *United States v. Kelner*,[12] the Second Circuit provided as follows:

> So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, that statute may properly be applied.[13]

And in *Lovell v. Poway Unified School District*,[14] the Ninth Circuit, relying in part on *Kelner*, expressed that the test for a true threat is "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault."[15]

---

**8.** *See, e.g., Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); *Melugin v. Hames*, 38 F.3d 1478, 1484 (9th Cir. 1994); *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir.1990).

**9.** 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664.

**10.** *Id.* at 707, 89 S.Ct. 1399.

**11.** *Id.* at 708, 89 S.Ct. 1399.

**12.** 534 F.2d 1020 (2d. Cir.1976).

**13.** *Id.* at 1027.

**14.** 90 F.3d 367 (9th Cir.1996).

**15.** *Id.* at 372 (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir.1990)); *see also Melugin*, 38 F.3d at 1484.

Whether the State has proven a true threat in the first instance is a question for the trier of fact.[16] The State argues that there is substantial evidence in the record to support a conclusion that Powell's letters were true threats, and under that standard, the superior court must be sustained. However, in both *Watts* and *Dennis v. United States*,[17] the Supreme Court reviewed the legal import of the defendant's statements after the jury found that the defendant violated the statute. As the *Dennis* court held, even though the jury must first decide if the defendant's conduct violates a criminal statute affecting speech, reviewing courts must determine as a matter of law if the "activity which constitutes a violation of the statute" is protected by the First Amendment.[18]

Powell's letters were not addressed to a particular individual but were forwarded to Swanston, the director of the CRC. At the time Powell wrote the letters, Powell was still months from his potential release date. On the whole, Powell's letters do not make detailed threats of harm against specific individuals. The potential harm described most exactly by Powell is what his reaction would be if he had to return to prison. "Ever been locked up? I have and never shall be again. I may get killed, I may elude pursuit. I may kill to escape. But I ain't having my rights read to me again. I shall never again be imprisoned, and this may mean that I must in the eyes of the law be shot on sight."

We have reviewed Powell's letters at length. Powell did describe himself as troubled and angry, but he did not direct specific threats of personal harm to Swanston or any other identifiable individual at the CRC. Powell described his juvenile record that included arson and asked rhetorically if the CRC had insurance for arson. Still he did not make direct threats of assault against identifiable individuals.[19] We recognize that this issue is close, but conclude that the letters are not so "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution"[20] to allow Powell's probation to be revoked on the basis that the letters supplied proof that Powell committed third-degree assault.

*Conclusion*

The judgments of the superior court and the district court are REVERSED.

MANNHEIMER, Judge, concurring.

I write separately to more fully explain certain aspects of our decision: the elements of the crime of coercion, the potential requirement that assaultive conduct be directed at the victim, and the scope of appellate review when the alleged *actus reus* of an assaultive crime consists solely of speech.

*The elements of the crime of coercion: the requirement of a "demand"*

The crime of coercion is defined in AS 11.41.530(a). According to this statute, the offense is committed if a person

> compels another to engage in conduct from which [they have] a legal right to abstain[, or to] abstain from conduct in which [they have] a legal right to engage

if this compulsion is accomplished by

> [making this other person] fear that, if the demand is not complied with, the person who makes the demand or [someone else] may [do one of the acts listed in subsections (1)—(6) of the statute].

This statute is based on § 212.5 of the Model Penal Code.[1] The Model Penal Code provision differs from our statute in that it contains only four subsections (instead of six) defining the types of threats that one must not use to induce someone else to engage in

---

**16.** *See Khorrami*, 895 F.2d at 1192; *Melugin*, 38 F.3d at 1485.

**17.** 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

**18.** *Id.* at 513, 71 S.Ct. 857.

**19.** *Cf. Petersen v. State*, 930 P.2d 414, 429 (Alaska App.1996) (noting a wide range of threatening and assaultive behavior directed against specific individuals and upholding the constitutionality of the stalking statute as applied to such behavior).

**20.** *Kelner*, 534 F.2d at 1027.

**1.** American Law Institute, *Model Penal Code* (Official Draft, 1962).

or refrain from conduct. (The drafters of the Model Penal Code consciously decided not to define the crime as broadly as the definition found in Alaska's coercion statute.[2]) But the same concept underlies both provisions: creating an offense that is patterned after extortion (an attempt to obtain money or property by means of threats), but which is considerably broader than extortion because it applies to attempts to obtain non-pecuniary benefits or to inflict various types of disadvantages upon another person.[3]

Coercion statutes based on the Model Penal Code have been challenged on constitutional grounds in other states. The seminal case on this issue is a decision from Oregon, *State v. Robertson.*[4] In *Robertson,* the Oregon Supreme Court ruled that its coercion statute impermissibly restricted the freedom of speech guaranteed under the Oregon Constitution.[5] Powell asks us to declare Alaska's coercion statute unconstitutional for much the same reasons. But we need not decide Powell's First Amendment challenge to the coercion statute because there was a flaw in the State's proof: the State failed to present evidence to satisfy each element of the crime.

AS 11.41.530(a) requires the State to prove that the defendant addressed a "demand" to the victim—a demand that the victim do something or refrain from doing something. This element limits the scope of the statute in a constitutionally significant way. If the statute did not require proof that the defendant addressed a demand to the victim—*i.e.,* if the statute merely required proof that the defendant recklessly caused another person to alter their conduct for fear of potential injury—then drunken or mentally unbalanced persons walking down the street might conceivably commit the crime of coercion if, by their erratic actions, they caused other pedestrians to cross the street to avoid the possibility of being accosted or confronted.

In Powell's letters to the halfway house, he referred to his past criminal conduct. Powell also spoke of his anger and frustration at the corrections system—thus suggesting that he might not be in full control of himself and that he might engage in assaultive or destructive behavior in the future. But Powell never demanded that the halfway house personnel do (or refrain from doing) anything in particular. Accordingly, even if we assume that Powell's letters caused the halfway house personnel to reasonably apprehend potential danger if Powell was assigned to their facility, Powell's act of sending these letters did not constitute coercion.

*The elements of third-degree assault: whether the threatening conduct must be directed at the victim*

By including a "demand" element in the definition of coercion, the legislature avoided the problem of holding someone criminally liable for "coercive" or "assaultive" conduct when that conduct was not directed at anyone in particular. But other Alaska criminal statutes conceivably raise the same problem. In particular, as we noted in *Petersen v. State*[6], Alaska's third- and fourth-degree assault statutes could arguably be interpreted to apply to defendants who, by their erratic or disquieting conduct, recklessly cause other people to fear potential injury, even though the defendants are paying no mind to these other people.[7] Thus, an intoxicated motorist whose driving was noticeably erratic might conceivably commit dozens or hundreds of acts of assault as they drove through town— one count for every person who observed the motorist's conduct and, as a result, feared injury.

In addition to the coercion charge, Powell was also charged with third-degree assault for writing his letters to the halfway house. Thus, his case potentially raises this issue of statutory interpretation. However, we need not decide this issue because we conclude that Powell's letters did not contain a "true threat" (a concept developed in *Watts v.*

---

**2.** *See* American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, Comment to § 212.5, found in the volume covering §§ 210.0 to 213.6 at pp. 266–67.

**3.** *See id.* at pp. 263–64, and the Alaska Legislature's Commentary to the coercion statute, found in 1978 Senate Journal, Vol. 2, Supp. No. 47 (June 12), p. 29.

**4.** 649 P.2d 569 (Or.1982).

**5.** *See id.* at 589–590.

**6.** 930 P.2d 414 (Alaska App.1996).

**7.** *See id.* at 428 n. 8.

*United States*[8] and other cases where assaultive crimes have been challenged on First Amendment grounds).

*The permissible scope of our review of the superior court's findings*

Someone familiar with the normal division of labor between trial and appellate courts would expect an appellate court to be bound by a trial judge's conclusion that a defendant's words constituted a "threat". A trial judge, to reach such a conclusion, must evaluate the content and the context of the defendant's words to assess (1) whether the defendant intended those words to instill fear in the victim, or was reckless regarding this possibility, and (2) whether a reasonable person in the victim's position would have understood the defendant's words as a threat. These assessments appear to be findings of fact that an appellate court must accept unless they are clearly erroneous.[9]

But, because of First Amendment concerns, the United States Supreme Court has established a special standard of review to govern cases where a defendant is charged with assault (or an assault-like crime) based on words alone. In *Dennis v. United States*[10], the Supreme Court declared that even though a jury must initially decide whether a defendant's words violate a criminal statute (in *Dennis*, the question was whether the defendant's words were a genuine incitement to immediate violence), it is ultimately the *reviewing court's* task to decide whether, consistent with the First Amendment, the defendant's words can be punished.[11]

We have employed this less-deferential standard of review in Powell's case: we have independently examined the content of Powell's letters to see if his words constituted a "true threat". For the reasons explained in Judge Stewart's majority opinion, we conclude that Powell's letters did not contain a "true threat", and thus Powell's act of sending these letters did not constitute the crime of third-degree assault.

---

8.  394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).

9.  *See, e.g., Wright v. Black*, 856 P.2d 477, 479 & n. 2 (Alaska 1993) ("Whether an estoppel exists is generally a question of fact. [Estoppel becomes a question of law only when the facts are clearly established.] [The trial court's] [f]indings of fact shall not be set aside unless [they are] clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.") (citations omitted).

10.  341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

11.  *See id.*, 341 U.S. at 511–14, 71 S.Ct. at 868–870. *But see United States v. Viefhaus*, 168 F.3d 392, 396–97 (10th Cir.1999), *cert. denied*, 527 U.S. 1040, 119 S.Ct. 2402, 144 L.Ed.2d 801 (1999) ("We consistently have held that whether a defendant's statement is a true threat or mere political speech is a question for the jury.... [Only if] there is no question that a defendant's speech is protected by the First Amendment [can] the court ... dismiss the charge as a matter of law.").