**Mitchell McGRAW, Appellant,**

v.

**Samantha COX, Appellee.**

**No. S–14315.**

Supreme Court of Alaska.

Sept. 14, 2012.

David A. Graham, Graham Law Firm, Sitka, for Appellant.

Allen A. Bell, Jr., Family Justice Center, Sitka, for Appellee.

Before: FABE, Chief Justice, CARPENETI, WINFREE, and STOWERS, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A couple had a turbulent relationship over the course of eight months, breaking up and reuniting several times. During the final break-up the woman sought a domestic violence protective order. The superior court granted the protective order based on a finding that the man "used coercion" when, in an effort to get the woman back, he threatened to (1) provide evidence to the woman's ex-husband's lawyers regarding a custody dispute, (2) report the woman's mother's alleged marijuana operation to the police, and (3) report the woman to the Office of Children's Services for sexually abusing her children. The man appeals, arguing that there was insufficient evidence to support the finding and that his conduct was constitutionally protected speech. Because there was sufficient evidence to show that the man committed a crime of domestic violence and because he waived his constitutional argument by failing to properly raise it, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

Samantha Cox and Mitchell McGraw were in a romantic relationship from August 2010 to March 2011. Both Mitchell and Samantha had children from previous relationships. Before and throughout the relationship Samantha was embroiled in a custody dispute with her ex-husband. She alleged that her ex-husband sexually abused their children and she cooperated with the Office of Children's Services (OCS) in its investigation. Mitchell was aware of the custody dispute and OCS's involvement in the case.

The couple broke up several times over the course of the relationship. The first time was October 2010, when Mitchell broke off the relationship. They resumed the relationship two weeks later after Mitchell sent Samantha flowers, purchased a diamond necklace for her, and "begged" her to come back to the relationship. Shortly after resuming the relationship, Samantha moved in with Mitchell.

The second time the couple broke up was in November. Samantha told Mitchell she was going to leave and Mitchell became upset, threatening to commit suicide and calling his children into the room so that Samantha could tell them that she was leaving. Because of his actions Samantha did not move out immediately, but waited some days and then left. During a telephone conversation, Mitchell told Samantha that he would call OCS and report that she abused her children. Samantha testified that Mitchell threatened to report her to OCS in order to "scare [her] out of breaking up with him."

The two resumed their relationship after Christmas and Samantha became pregnant. In January Mitchell broke off the relationship again. Samantha spoke with Mitchell about working out a custody agreement for their unborn child, but Mitchell said he would not give up the child and would call his lawyers. Samantha considered this assertion a threat because she did not want to get drawn into another custody battle. Nonetheless, the couple remained separated.

Shortly thereafter the couple reconciled again after Mitchell "begged to get back together." The final reconciliation was short lived, and Mitchell again broke up with Samantha on March 16, 2011. On March 19, he began texting her asking to resume the relationship. Starting at mid-morning, he sent many texts, culminating in a request to see her. He also sent her flowers. Samantha agreed to see him and give him a book that the two were sharing. Samantha testified that when he arrived to pick up the book he was crying, begging for her to return to him, and had injuries on his head that he would not explain, which frightened Samantha.[1] She definitively told him she did not want to resume the relationship. He then drove away and shortly afterwards texted her that he was going to "turn everything over to [her ex-husband's] lawyers[.]" He threatened to tell the lawyers that she "brainwashed" her children regarding the sexual abuse allegations. Mitchell also noted that he saw Samantha allow her child to fondle her breasts. Samantha stated that she was concerned that he would disrupt her custody case. Samantha told him to stop texting her several times before he eventually complied.

Samantha sought a temporary ex parte domestic violence protective order, which was granted and served on March 22. After Mitchell was served with the protective order he made a statement to the police alleging that Samantha engaged in sexual misconduct with her children and that her parents cultivated marijuana. He also provided negative information about Samantha to her ex-husband's lawyers.

### B. Proceedings

Samantha sought a long-term domestic violence protective order. After a contested hearing, Superior Court Judge William B. Carey found by a preponderance of the evidence that Mitchell committed a domestic

---

1. Samantha testified that Mitch had told her that previous wives and girlfriends had beat him up; and she noted that he had saved pictures of these prior injuries on his camera. She further testified that when he came over to her house with a cut on his head: "I was concerned because he wouldn't tell me where he got the cuts. And because I know he'd made allegations before that women had beat him up, I was afraid he would say the same thing about me."

violence crime that supported imposing a long-term domestic violence protective order. The superior court found that Mitchell "used coercion" in an "effort to restore the affections of [Samantha]." There were three specific coercive events: (1) threatening to go to the police regarding Samantha's parents' alleged engagement in a marijuana growing operation; (2) threatening to report to OCS that Samantha engaged in sexual misconduct with her sons; and (3) threatening to call Samantha's ex-husband's lawyers and provide negative information about her to aid her ex-husband in their protracted custody dispute. The superior court declined to find any other instances of domestic violence. The superior court granted the protective order based on the coercive acts.

Mitchell appeals, arguing that there was insufficient evidence to support a finding that he committed the domestic violence crime of coercion and that even if there were enough evidence, his actions were protected speech.

## III. STANDARD OF REVIEW

▮▮▮ We review a trial court's factual findings for clear error.[2] We will reverse only when left with a "definite and firm conviction ... that a mistake has been made."[3] We apply our independent judgment to questions of law.[4]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding That Mitchell's Actions Justified A Long–Term Protective Order.

Mitchell argues that there was insufficient evidence to establish that he committed a crime of domestic violence justifying the protective order. He first notes that the three elements of coercion "require that the perpetrator (1) make a demand, (2) convey a threat to be carried out if the threat is not complied with that (3) causes the victim [to] do or refrain from doing something because of fear that the threat will be carried out." He asserts that there was no specific demand, no "true threat," and no evidence that Cox took or refrained from taking any action as a result of any threat. Therefore, he argues, his actions did not constitute coercion.[5] Samantha replies that there was sufficient evidence because coercion does not require an explicit demand and that viewed over the course of their manipulative relationship it was correct to infer that his actions were designed to coerce her to return to him.

The superior court found that Mitchell used "coercion" to "restore the affections of [Samantha]" in the form of three actions: (1) threats to report Samantha's parents to the police for growing marijuana in violation of AS 11.41.530(a)(2) (accusing someone of a crime); (2) threats to report Samantha to OCS regarding Samantha's inappropriate sexual behavior with the children in violation of AS 11.41.530(a)(4) (causing a public servant to take actions against a person); and (3) threats to contact Samantha's ex-husband's lawyer with negative information about her in violation of AS 11.41.530(a)(6) (providing testimony about the person). Alaska Statute 11.41.530(b) provides a defense to coercion in certain circumstances if the defendant "reasonably believed that the accusation ... was true." In this regard, the superior court found that Mitchell did not establish that he

2. *Stewart v. Elliott*, 239 P.3d 1236, 1240 (Alaska 2010).

3. *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008) (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)).

4. *Jacob v. State, Dep't of Health & Soc. Servs.*, 177 P.3d 1181, 1184 (Alaska 2008).

5. AS 11.41.530(a), defining the crime of coercion, provides in relevant part:
A person commits the crime of coercion if the person compels another to engage in conduct from which there is a legal right to abstain or abstain from conduct in which there is a legal

right to engage, by means of instilling in the person who is compelled a fear that, if the demand is not complied with, the person who makes the demand or another may
. . . .
(2) accuse anyone of a crime;
. . . .
(4) take or withhold action as a public servant or cause a public servant to take or withhold action;
. . . .
(6) testify or provide information or withhold testimony or information with respect to a person's legal claim or defense.

reasonably believed that Samantha's parents were growing marijuana or that Samantha acted inappropriately with her children.

■ We affirm the decision of the superior court. Although we agree with Mitchell that he did not commit the crime of coercion—because Samantha was never compelled to act in response to the threats—we nonetheless conclude that the actions were sufficient to support a domestic violence protective order. Under AS 18.66.990(3) "domestic violence" and a "crime involving domestic violence" mean "one or more of the following offenses ... or *an attempt* to commit the offense." (Emphasis added.) The statute then lists several domestic violence crimes, including coercion.[6] Black's Law Dictionary defines "attempt" as including "[t]he act ... of making an effort to accomplish something[.]"[7] The superior court stated that Mitchell "in an effort to restore the affections of [Samantha] ... used coercion." We interpret this as a finding that Mitchell attempted to coerce Samantha.

■ There is sufficient evidence supporting the conclusion that Mitchell was attempting to coerce Samantha into returning to him. Mitchell's threats to talk to her ex-husband's lawyer and OCS occurred only after Samantha told Mitchell that she did not want to be in a relationship with him. These statements occurred in the context of a relationship that was marked by manipulation. For example, Samantha testified that, when they broke up in November, Mitchell threatened to commit suicide and threatened to call OCS to report that she abused the children, even though he recanted his threat when he found out he was on a speaker phone and was overheard by Samantha's mother. He also suggested that Samantha would not be able to see her unborn child if she left his house or left the relationship. Additionally, it was Samantha's strong statement that she no longer wished to have a relationship with him, by filing for a protective order and directly rejecting him, that triggered his visits to the police station.[8] The superior court found that these acts constituted use of coercion, aimed at frightening Samantha and compelling her to return to him. This finding was not clearly erroneous.

Further, Mitchell does not argue that he never made the statements on which the superior court relied. Rather, he argues that those statements were not coercive because there must be a "true threat," that is, an explicit threat that "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution."

■ Mitchell's reliance on the concept of a "true threat" is misplaced. "True threat" relates not to the coercion statute, but to the assault statute.[9] The coercion statute and the assault statute address different behaviors. The coercion statute requires that the perpetrator demand something from the victim. This demand may be implicit or explicit, but must be sufficiently specific such that it communicates the act desired from the victim.[10] The superior court properly found such a demand to be present in this case—it was a demand for Samantha's affections, as

6. AS 18.66.990(3)(A); AS 11.41.530.

7. BLACK'S LAW DICTIONARY 146 (9th ed.2009).

8. The superior court found that one of the threats Mitchell made was a threat to tell the police that Samantha's parents were growing marijuana. But our review of the record shows that Mitchell never told Samantha he was going to tell the police about the marijuana; he simply did so in the police interview. Nonetheless, Mitchell's other actions support the superior court's finding, so the error is harmless.

9. *See Powell v. State*, 12 P.3d 1187, 1190 (Alaska App.2000).

10. *See id.:*

> We conclude from our independent examination of Powell's letters they do not contain any explicit demand for *specific action* or restraint from action on the part of anyone at the CRC. Furthermore, [there was no argument that there was] an implicit demand that anyone at the CRC should act or refrain from *acting in a specific way.*

(Emphasis added.); *see also Konrad v. State*, 763 P.2d 1369, 1378 (Alaska App.1988) ("To prove attempted coercion, the prosecution [must show] ... [the defendant acted] with the express purpose of coercing [the victim] to abstain from pursuing her custody claim.").

discussed above. This finding was supported by the evidence.

Because there was sufficient evidence supporting a finding that Mitchell attempted to commit the crime of coercion, we affirm the superior court.

### B. Mitchell's Argument That His Statements Were Protected Is Not Properly Before The Court.

Mitchell next argues that his speech was protected and could not justify a protective order because a necessary element of coercion is a finding that the speech is not protected. Samantha asserts that this argument is not properly before us because he did not raise it before the superior court. Samantha is correct.

Mitchell did not raise his constitutional argument in the lower court, thus failing to preserve it for appeal.[11] Additionally, Mitchell has waived his argument because he did not adequately brief it.[12] He wrote only one sentence and a heading in his opening brief regarding the nature of his protected speech. This waiver was not corrected by the expansion of his argument in his reply brief.[13] This argument is not properly before us, therefore we decline to address it.[14]

## V. CONCLUSION

Because there was sufficient evidence to find that Mitchell committed a domestic violence crime and because he waived his constitutional argument, we AFFIRM the decision of the superior court.

---

**11.** *Millette v. Millette,* 177 P.3d 258, 267–68 (Alaska 2008).

**12.** *See Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (citing *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980))).

**13.** *See id.* (citing *Hitt v. J.B. Coghill, Inc.,* 641 P.2d 211, 213 n. 4 (Alaska 1982)).

**14.** In addition, we note that the coercion statute does not prohibit the statements Mitchell made to the police or to the lawyers, but rather it prohibits threatening to make those statements in an attempt to achieve some desired end. Mitchell overlooks this distinction in his substantive argument on this issue.